## KING AX CO. et al. v. HUBBARD.

### (Circuit Court of Appeals, Sixth Circuit. October 3, 1899.)

### No. 680.

1. PATENTS—VALIDITY—MACHINE FOR FORGING AXES.

The Taylor patent, No. 500,084, for an improvement in the manufacture of axes, which covers a new machine for making the body of the ax, consisting of a closed die with a yielding bumper or plunger which acts as an anvil against the head of the ax in forging, preserving its form while yielding to permit the die to adapt itself to the slightly varying quantities of metal used, and preventing the formation of fins, is valid; the invention being novel, not anticipated, and of great utility, as attested by its general use.

2. SAME—INFRINGEMENT.

One who appropriates the substance of a patented invention cannot avoid a claim of infringement, by deliberately impairing the function of one element without destroying the substantial identity of the structure, operation, and result.

3. SAME—LIBERAL CONSTRUCTION AS TO EQUIVALENTS.

The more meritorious a patent, the more liberal will a court be in applying the doctrine of equivalents to cover devices adopted to avoid a claim of infringement while obtaining the substantial benefit of the invention.

Appeal from the Circuit Court of the United States for the Eastern Division of the Northern District of Ohio.

Chester Bradford, for appellants.

Clarence Byrnes and Thomas W. Bakewell, for appellee.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

TAFT, Circuit Judge. This is an appeal from a decree in a patent case in which the circuit court found the patent of the complainant to be valid, and to be infringed by the defendant's machine. 89 Fed. 713. The patent was No. 500,084 and was granted on June 20, 1893, to C. W. Hubbard, as assignee of James Taylor, for an improvement in the manufacture of axes. The answer set up the defenses of invalidity for want of novelty, public use for more than two years before the application, and abandonment and noninfringement.

The patentee, in his specifications, says:

"My invention relates to the manufacture of axes and other similar eye tools, and is designed to produce a much truer, neater, and better finished article than has hitherto been possible; and, to that end, it consists in a pair of dies having a hole therethrough, and a plunger or hammer head which enters this hole and is yieldingly pressed against the ax as it lies in the mold. It also consists in the construction and arrangement of the parts as hereinafter more fully described and set forth in the claims. In the drawings, 2. 2, represent the vertical guides of a die press, the cross head, 3, of which reciprocates between these guides and bears the upper die, 4. The lower die, 5, is carried upon the bed of the machine, and at one end of the dies their meeting faces are correspondingly recessed to form a hole within which fits the plunger or hammer head, 7, which is carried at the inner end of a sliding bar, 8, passing through one of the guides, 2, and pivoted at its outer end to a weight, 9, which bears against the same and presses it inwardly. A shoulder, 10, is formed upon the plunger, which prevents it entering too far into the mold cavity; and, as seen in Fig. 2, the hole through which it passes is of about the same size as the end of the matrix or cavity. The weight is suspended and held in place by a link, 11, and serves to press the squared inner end of the

Fig. 1.

Fig. 2.

plunger against the rear end of the ax lying in the dies. The dies have the usual side recesses to receive the mandrel 12, around which the ax poll is formed, and, with the exception of the end recesses for the plunger, are similar to those commonly employed. The operation is as follows: The ax with the mandrel still passing therethrough is placed in the cavity in the lower die, with the plunger butting against the rear end of the poll, and the upper die is reciprocated. As the ax lies in a box die, it is compressed in all directions by the blow of the upper die, and is forced into the exact form desired, with a finely finished surface and a squared end to the poll, while the formation of fins between the dies is prevented by the plunger, which will give sufficiently to allow the flow of the metal endwise. The plunger or hammer head will not, however, allow sufficient endwise flow of the metal to distort the ax on account of the quickness of the blow, it acting in the manner of an anvil. The plunger will adjust itself automatically to an ax having too little or too much metal therein, and finish the same as perfectly as one having exactly the right amount; and a spring may be employed to hold the same in place, though I prefer the weight shown. The advantages of my invention will be appreciated by those skilled in the art. The flowing of the metal sidewise, and the lengthening of the eye portion, which always takes place when open dies are used in finishing, are entirely obviated, as well as the fin formation which always occurs when ordinary box dies are employed. The surface of

the ax is compressed and given a high polish, and its edges are made sharp and exact. Many variations will suggest themselves to those skilled in the art without departure from my invention, since what I claim is: (1) A pair of dies having a hole, a plunger movable within the hole, and means for continuously forcing in said plunger with a yielding pressure, substantially as described. (2) A stationary die and a reciprocatory die having mating recesses at one end forming a hole opening into the die cavity, a plunger within the hole, and means for exerting a continuous yielding pressure upon said plunger, substantially as and for the purposes described. (3) A stationary die and a reciprocatory die having mating matrix cavities, a hole leading through the die to the matrix, a plunger in the hole, and a weight arranged to exert a constant pressure upon said plunger, substantially as described."

The following sketch aids in understanding the machines:

### TAYLOR PATENT.

The device of the defendant, as shown by a sketch of defendant's expert, is as follows:

The usual method of making axes is to cut off for the ax poll a sufficient piece from a bar of iron, and to form the hole for the handle or the eye by bending the bar double over a mandrel. After the poll is forged, the steel edge or bit is welded to it. Before the Taylor invention, polls were first forged roughly into shape by hand hammering. Subsequently small trip hammers were used in forging, and much increased the output per day. In this process, the poll was forged by three or four or more blows of the trip hammer on an open die. A box die is distinguished from an open die in the fact that, when the upper and lower faces of the box die are together, the die cavity of the box die is entirely closed, while in an open die the sides are open. An improvement in the manufacturing of axes by the use of box dies was patented by Palmer & Hubbard in 1871. The method consisted in taking the poll in its roughest shape, and putting it in a box die, and then dropping upon it a hammer in which was the other half of the die. This operation was repeated two or three times, then the bit was welded to the poll, and that again was subjected to the operation of another box die and drop hammer. The objection to the use of the box die, as shown in the Palmer & Hubbard invention, was the difficulty of adjusting the quantity of metal so exactly that the operation of the die upon the metal in the rough would not result in the excess of metal appearing in large and obstinate fins all around the ax poll at the line of contact between the two faces of the dies. The removal of the fins required costly sawing and finishing, and rendered the process impracticable. It was possible by the nicest measurement and weight of the material to produce a good poll, but for commercial purposes such nice adjustments were not practicable. The box die was therefore abandoned, and recourse had to forging with the open dies and the small drop hammers before referred to. The Taylor invention is shown by the expert evidence on both sides to produce exactly the effect which the specifications describe. No fins form at any place on the poll, except sometimes at its head, and these are so slight as to be easily removed in the finishing process. The same number of men can make 2,500 ax polls in a day by using the Taylor device, when by earlier methods they could make but 500, and the cost of making axes has thus been reduced about 15 cents per dozen.

One of the defendant's experts attempted to show that the Taylor patent is invalid for want of novelty. Dayton, the other expert for the defendant, does not say so, but only seeks to limit the scope of the patent by prior devices in the art. Box dies in the manufacture of axes were old. The drop hammer in the forging of axes was old. In the Hammond patent and in the Cole patent, closed dies had been formed by bringing together more than two pieces. In the Cole patent, and possibly in the Hammond patent, springs or cushions were used to permit one of the bases making up the die to yield where there was an excess of metal in the ax poll. This was, as stated in the patents, for the purpose of preventing a breaking of the machine. In neither the Cole nor the Hammond patent was the compression of the metal in the dies effected by a blow, but only by grad-

ual approximation; and herein is the difference between the older machines and Taylor's in principle, and herein is the reason why Taylor succeeded, and the older machines were but paper patents, which never went into use. The novelty and success of the Taylor device is the anvil effect of the blow of the hammer, and the inertia of the bumper bar or plunger forming the rear wall of the die and abutting the head of the poll, which result in driving the outflowing red metal back around the mandrel, thus forming a perfect eye, in squaring or "upsetting" the outflowing metal in the head of the poll making a smooth and flat head, and in yet yielding sufficiently to permit a flow of the excess of metal beyond the die cavity to form the head, and thus to avoid the formation of fins all around the poll. It thus has all the advantages of a rigid box die when the amount of metal used is nicely weighed and measured exactly to fill the die, and yet does not require the nice weighing or measuring of the metal. This had never been accomplished before the Taylor invention. Mr. Dayton, defendant's expert, when asked the following question: "As far as shown by the prior patents in this suit, was Taylor the first to provide an end wall which was yieldingly held so as to close the end of the matrix cavity in the stationary die while the upper die moves downwardly?"—answered, "Yes." Mr. Hood, defendant's second expert, said: "So far as I know, Taylor seems to have been the first to have used box dies, one of which was acted upon externally to forge the metal, and a third die which was 'continuously and yieldingly pressed forward to form a portion of the die cavity."

In the light of these facts and admissions, we think the case presents very little room for discussion of the meritoriousness or novelty of the invention, and that the only issue of serious moment is that of infringement. The question is whether the defendant's machine comes within the three claims of the patent or any one of them. For the sake of clearness we repeat the claims:

"What I claim is: (1) A pair of dies having a hole, a plunger movable within the hole, and means for continuously forcing in said plunger with a yielding pressure, substantially as described. (2) A stationary die and a reciprocatory die having mating recesses at one end forming a hole opening into the die cavity, a plunger within the hole, and means for exerting a continuous yielding pressure upon said plunger, substantially as and for the purposes described. (3) A stationary die and a reciprocatory die having mating matrix cavities, a hole leading through the die to the matrix, a plunger in the hole, and a weight arranged to exert a constant pressure upon said plunger; substantially as described."

It is conceded by the defendant's witnesses that, when the defendant first began to use a machine of this character, it used the Taylor machine, constructed exactly as the patent directs; that the defendant's officers were warned by Hubbard that they were infringing his patent; that they took the infringing machine, and for the purpose of avoiding the claims of the patent they made some changes, and produced the defendant's present machine. A comparison of the sketch of the defendant's machine and the patent will show how slight these changes were. The comparison may be made by reference to the following illustrations:

TAYLOR PATENT DIES.

DEFENDANTS' DIES.

The only change made by the defendants was to shorten the hole at the back of the die. They planed away the rear of the ends of the dies transversely to a point substantially flush with the head end of the matrix cavity, but left this end open as before. They then made a bumper die of larger cross section than the hole, which was yieldingly pressed against the end of the dies to close the hole. When asked why this rear recess was planed out in the dies, Oliver King, one of the officers of the defendant company, answered, "We planed

97 F.—51

the recess in order not to have any trouble with Mr. Hubbard." And when asked whether he considered that by the recess he evaded the Taylor patent, and avoided trouble with Mr. Hubbard, he replied, "That is what we were trying to do." Now, it is pressed on the court that the defendant's machine does not infringe the claims of the Taylor patent, because the bumper die forming the rearward end of the matrix cavity is not a plunger, and is not in a hole of the die. It is conceded that the bumper die of defendant performs every function of the plunger in complainant's machine by closing up the hole of the matrix cavity, and yieldingly resisting the flow of the excess of metal, and thus avoiding the fins on the poll, except that it does not perform the function of avoiding the fins quite so well in this, to wit, that slight fins will sometimes form around the rim of the ax head at the point of intersection between the bumper die and the rearward hole of the matrix cavity, whereas such fins are better prevented when the hole extends beyond the matrix cavity and the plunger is within the hole. The general function of the hole beyond the matrix cavity in the complainant's machine is that of a guide for the bumper die or plunger so as to keep it in the position where it forms the rearward end of the matrix cavity. This function in the defendant's machine is performed by guides in the upright frame of the trip hammer somewhat removed from the dies. The contention on behalf of defendant is that the hole to the rearward of the matrix cavity with its sides has, in the complainant's patent and claims, the function not only of guiding the plunger, but also that of restraining the formation of fins at the edge of the ax head, and that the defendants eliminate the element of the hole, and dispense with the function of preventing the rearward fins. They thus avoid infringement, it is said, by omitting one element of the combination claims of the patent. The preventing the rearward fins is not a necessary function of the sides of the hole and plunger. There is nothing in the claims which limits the size of the hole extending rearward from the matrix cavity, and nothing which limits the size of the plunger, except its description as a plunger. If this term be taken to indicate that the plunger must be small enough to fit in the hole, as claimed for defendant, then any device would be literally within the patent, the plunger of which should fit in the hole, however large the hole might be. If now the hole to the rear of the matrix cavity were made larger than the cavity itself at its rearward end, making a shoulder above and below the matrix cavity, and just outside of it, and the plunger fitted in this hole, we should have a device exactly and literally within the terms of the claims, though evidently, from the specifications, not the preferred form of the device. In such a form the hole would not perform the function of preventing fins at the edges of the matrix cavity any better than does the arrangement in the defendant's device. The main function of the hole would then, as now, be that of a guide for the movement of the plunger or bumper bar so as to keep it flush with the rearward end of the matrix cavity, but it would not discharge as well the other function of preventing fins at the edge of the ax head. Can it be doubted that the bumper bar and guides in the upright or die housing of the defendant's machines are the exact

equivalents of the hole and plunger in a machine thus constructed, within the letter of the claims of the Taylor patent? This is an instance, not infrequent in patent litigation, where the infringer has sought to evade the claims of a patent, the substance of which he is appropriating, by deliberately impairing the function of one element, without destroying the substantial identity of structure, operation, and result. Sewall v. Jones, 91 U. S. 171; Coupe v. Weatherhead, 16 Fed. 673; Machine Co. v. Binney, 24 Fed. Cas. 653. This court, following the supreme court, has pointed out in a number of cases that, the more meritorious the patent, the more liberal will the court be in applying the doctrine of equivalents to cover devices adopted for the purpose of appropriating all that is good in a patent without rendering the tribute which the patent law was intended to secure, for a temporary period, to those who by their ingenuity have made possible real progress in the industrial arts. Bundy Mfg. Co. v. Detroit Time Register Co., 94 Fed. 524; McCormick Harvesting Mach. Co. v. Aultman, Miller & Co., 37 U. S. App. 299, 16 C. C. A. 259, and 69 Fed. 371; Wells v. Curtis, 31 U. S. App. 123, 13 C. C. A. 494, and 66 Fed. 318; Miller v. Manufacturing Co., 151 U. S. 186, 207, 14 Sup. Ct. 310.

The defenses of prior use and abandonment can very easily be disposed of. This patent was applied for in 1892. There is evidence that an experiment was made by complainants to test the practicability of such a device in 1887, but that only half a dozen ax polls were made in the course of the experiment, and it was not taken up again by the complainant and put into practical operation until 1892; that the fire in the complainant's works prevented an earlier development of that which the experiment of 1887 indicated might become a useful improvement. Under the doctrine of the case of Manufacturing Co. v. Sprague, 123 U. S. 249, 8 Sup. Ct. 122, it is clear that the evidence here does not make a case of public use, within the meaning of the statute. Nor is there any more weight in the defense of abandonment. Taylor thinks he conceived of the patent some time between 1883 and 1887. Nothing was done by him or any one else with respect to it until the attempt was made by Hubbard to follow Taylor's directions in the experiment in 1887, and subsequently by the successful manufacture and operation of the machine in 1892. Taylor then applied for the patent. There is here no evidence of abandonment, but simply delay in the development of the conception by practical application. If, as between Taylor and some other inventor, the question were of prior invention, and the other inventor had conceived of the invention some time after 1883, and had perfected it before Taylor, it might be contended that Taylor's conduct constituted laches, giving the other priority, but here there is no prior inventor claiming a right to the patent. At least, upon the question of abandonment, no such issue arises.

Evidence has been introduced of a man named Estep, who claims that he first conceived of this device, and that the invention was his, and not Taylor's. This is denied by Taylor and Hubbard, both of whom had full knowledge of all the facts. In view of the failure of Estep for many years after his alleged conception, and after Taylor

had taken the patent, to claim the invention as his own, we have only to say that we cannot credit Estep's evidence. Other witnesses are called upon to corroborate him, but they fail to do so. The decree of the circuit court is affirmed, with costs.