SHELBY STEEL TUBE CO. v. DELAWARE SEAMLESS TUBE CO. et al.

(Circuit Court, E. D. Pennsylvania. February 20, 1907.)

1. PATENTS—SUIT FOR INFRINGEMENT—PROOF OF ASSIGNMENT.

An assignment of a patent is sufficiently proved in a suit by the assignee for its infringement by the testimony of one of the subscribing witnesses, unless there is some special reason for requiring more.

2. SAME—DELIVERY.

That an assignment of a patent was recorded, and is produced and put in evidence by a subsequent assignee, in a suit for infringement, is sufficient evidence of its delivery.

3. SAME—SUFFICIENCY OF ASSIGNMENT.

A conveyance by a corporation of all of its property, including its "good will, patents, trade-marks," etc., is effective to pass title to a patent then owned by it, although not described therein.

4. SAME—UNRECORDED ASSIGNMENT.

An assignment of a patent is effective to pass title as against an alleged infringer, although not recorded.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 279.]

5. SAME—INFRINGEMENT—CHANGE IN FORM.

Except where form is of the essence of the invention in a patented device, it is of little weight and a variation therefrom, while retaining the principle and mode of operation of the invention will not avoid infringement.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 372.]

**6. Same.**

Where the mechanism of an alleged infringing machine is substantially the same as that of the patent, the fact that for some reason, designed or otherwise, its operative effect is made to vary, cannot be altogether accepted as avoiding infringement, especially where the variance is the result of not doing all with the mechanism that might be done; its possibilities under ordinary and proper use being the test.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, §§ 372, 373, 380.]

**7. Same—Machine for Making Tubing.**

The Stiefel patent, No. 551,340, for a mechanical device for making metal tubing, while only for an improvement upon that of the prior art, covers an improvement of value, and was not anticipated and discloses invention; nor is it strictly limited to a construction in which a plane or flat surface of one of the disks by the action of which the tube is shaped is opposed to a beveled surface on the other. Also *held* infringed.

In Equity.

Thomas W. Bakewell and Charles MacVeagh, for complainants.
Charles K. Offield, for defendants.

ARCHBALD, District Judge.[1]   The patent in suit is for a mechanical device for making metal tubing.   It was granted to R. C. Stiefel December 10, 1895, and title is now vested in the complainants by sundry mesne conveyances.   This is denied by the answer, and contested here; but is sufficiently established.   The objection to the assignment from the patentee, that it was not proved by both the subscribing witnesses, is captious.   It is elementary law that but one need be called, except where there is some special reason.   17 Cyc. 435. Still less is there in the suggestion that there is no proof of delivery. Not only was the assignment put on record, which is itself evidence of a delivery, but it was produced before the examiner by the complainants, showing that it is in their possession, and is presumed to have got there regularly.   Pray, what would the respondents have more?

It is further said, however, that the subsequent assignment to the complainants is ineffectual, because there is no description of the patent, and because it was not recorded.   But the assignment, in terms, is of all the property of the company executing it, in whom title was vested at the time, specifically including, also, "the good will, patents, trademarks," etc., which certainly was good as a conveyance between the parties, and much more as against a stranger.   It has been held that a sale on execution of all the property, rights, and franchises of an insolvent corporation was effective to pass title to a patent owned by it.   Erie Wringer Mfg. Co. v. National Wringer Co. (C. C.) 63 Fed. 248.   And, if so, why not also a voluntary conveyance in similar terms?   It is of no consequence that in this indefinite shape the assignment was not in a condition to be recorded; the only purpose of this being to protect subsequent bona fide purchasers for value.   22 Am. & Eng. Encycl. Law (2d Ed.) 418.   It is somewhat strange, however, that so important a matter should be left open to question when it was so easily remedied.

[1] Specially assigned.

The standing, if not the validity, of the patent, is also challenged. Turning for its determination to the earlier art, it is interesting to observe that metal tubing came into vogue with the invention of illuminating gas, in 1815, in England; the discarded musket barrels thrown out by the termination of the continental wars being utilized for that purpose. This was followed at a later stage by lap-weld and butt-weld tubes, which were made by heating a strip of sheet iron or steel to a proper heat, and then bending it into tubular form, with overlapping edges, and welding them together on a mandrel, for the one; and by drawing the sheet through a ring, or bell-shaped die, and forcing together and welding the abutting edges, for the other; the strength of each depending upon the success of the weld. This was the condition of things until 1885, when it was discovered by Mannesmann, a German, that tubes could be produced without seam or weld by passing a metal billet or blank between converging beveled disks or rolls, revolving in the same direction, by which it was flattened and compressed and subjected to a violent kneading action, which ruptured and opened up the center; and the billet in that condition, being forced forward against the point of a piercing mandrel, located at the axis of the pass, was further opened and shaped between the rolls and the mandrel, a hollow seamless tube being the result.

*Mannesman.*
*Patent 361,954*

This was a notable advance, to which everything that follows must bow. But it still left something to be desired. A great variety of devices are shown in the numerous Mannesmann patents, taken out upon it, but the one characteristic which appears in them all is that the rolls are symmetrically placed, with their axes in parallel planes, and the same sized diameters always opposed. The consequence is that, the surface of the billet being subjected to a different speed of rotation as it advances between the converging lines of the rolls by which it is gripped, a violent spiral wresting or twisting of the particles or fiber of the metal is produced. This seems to a certain extent to have been regarded as an advantage, and patents based upon it are found. And it may, indeed, impart a certain structural strength to the tube. But steel billets are cast, and so crystalline in character, and the twisting opens up any cracks or flaws, because of the extreme surface tension. Superficial defects frequently exist, and, being aggravated in this way, an elongated longitudinal seam is produced, winding around the tube and making it worthless; a material percentage of the product having to be consigned in consequence to the scrap heap. Mannesmann seems in the end to have recognized that this more than offset the other advantages, and sought to overcome the twist by providing barrel-shaped rolls, with larger diameter in the middle than at either end, the one being supposed to undo the effect of the other,

the twist given by the converging lines of the rolls at the beginning of the operation being taken out by the diverging lines at the other end. But this only made matters worse. It may have taken out the twist, but "with the knife." The metal being first twisted one way and then twisted back, if a seam was started by the one, it was only increased and aggravated by the other, doubling, instead of removing, the defect. It was to remedy this situation that the patent in suit was designed. The device stands no doubt merely as an improvement upon Mannesmann, making use, as it does, of the same general principle and character of mechanism. But it is clearly distinguished, after all, by the different form and arrangement adopted. There are beveled rolls or disks in both between which the billet or blank being first compressed is forced against the point of a piercing mandrel after it has been thus opened up. But, reversing the Mannesmann, the rolls are unsymmetrically set, one above the other,

*Mannesman Patent 361,962*

with their axes out of line, and so made to overlap that the bevel of the one is opposite the flat or plane surface of the other, whereby, except at the center, unequal circumferences, with different speed of rotation, are presented to and encountered by the billet in its course.

It is idle to argue that it involved no invention to rearrange the rolls in this way, accomplishing as it did what Mannesmann, an inventor of marked ability in the same line, had endeavored and failed to effect, or, that it was in fact no advance, although reducing the waste from over 4 to 1⅓ per cent. And equally unavailing is it to suggest either that it was anticipated or that it amounted to no more than an adapted or double use,

*Mannesmann Patent No. 389,585, Fig. 7.*

because sundry devices with overlapping disks or rolls, between which metal rods or tubes are somewhat similarly drawn or forced, are to be found in the general mechanical art. Such, for example, as the the Reese (1867), for straightening cylindrical metal bars; the Brooksbank (1874), for rolling and finishing the same; the Hoagland (1874),

for making cold rolled shafting; the Butler (1877), for rolling, straightening, and finishing bars and tubes; the Reese (1881), for burnishing and ductilizing bars, shafts, and tubes; the Dyson & Hall (British, 1870), for rolling and finishing the same; and the diffuse Robertson (British, 1878), for. drawing, straightening, shaping, and smoothing wires, rods, tubes, shafts, etc., and doing a little of everything in that connection. The Flagler (1889) and the Jackson & Carlson (1891), which are also in the record are merely developments of the Mannesmann, designed to take advantage of rather than eradicate the spiral twist, and do not need to be further noticed. As indicated by their recited purposes, the others mentioned belong to a class of machines in which beveled disks, rotating in the same direction, and forming a substantially parallel-sided pass, are similarly employed, to roll, straighten, finish, smooth, or polish the surface of cylindrical bars, shafts, rods, and tubes. But not only do they fail to show the precise form or relation of the rolls or disks of the device under discussion, but there is nothing in the use to which the rolls are put that is in any wise similar to or suggestive of their purpose here; the whole end and aim of the one being to affect superficially the articles treated, while the other ruptures structurally the billet operated upon, opening up the center, and developing and shaping it into a tube without seam or twist, an entirely different and unrelated result, as well as product.

The real controversy between the parties is over the charge of infringement. This depends upon the construction to be given to the patent, and whether the defendants' device is within its terms. The limitations, if any, imposed by the existing art, no doubt, are to be considered, and the original application, which was abandoned when the inventor, at the suggestion of the examiner, changed over from a process to a machine patent, and any concessions made in that connection, upon which the patent was obtained, are not, of course, to be lost sight of. These are familiar rules, not disputed by the complainants, but there is little occasion for their application here. There are two claims to the patent, both of which are relied on, as follows:

"1. The combination of two parallel disks revolving in the same direction and overlapping each other, one of said disks being beveled at its outer edge which beveled surface is opposed to a portion of the plane surface of the other disk; the outer diameter of this plane surface and the inner diameter of the beveled surface opposed to it being substantially the same and the edges formed by both diameters intersecting the same transverse plane through the pass between the disks; the angles of the opposing surfaces converging to this plane which is at the narrowest part of the pass, with a conical mandrel lying in the axis of the pass at its exit side, substantially as set forth.

"2. The combination of two parallel disks revolving in the same direction, beveled at the edges of their adjacent faces and overlapping each other so that the beveled portion of one disk lies opposite a flat portion of the other disk, the edges formed by the smaller diameters of the beveled portions of the disks intersecting the same transverse plane through the pass between the disks whereby the sides of the pass first converge to this plane and then diverge beyond it; with a piercing mandrel located between the diverging sides of the pass and exactly in axial line of the pass, substantially as hereinbefore set forth."

The object of the invention, as already stated, is to make tubing without torsional wrest or strain. "This result," according to the speci-

fications, "is accomplished by imparting to the blank a substantially uniform speed of rotation throughout all those portions of it in the grip of the working surfaces of the disks. At the point X, X, where the pass is most contracted, and the grip of the disks on the blank the greatest, the radii, x, x', of the two disks is the same and consequently the speed of rotation imparted to the blank at this point by both disks is the same. At the line, Y, Y, in the pass, while the radius, y, of one disk is smaller than the common radii, x, x', of both disks, the opposing radius, y', of the other disk is proportionately greater than the common radii, x, x', so that the mean effective rotative action imparted to the blank by the two disks at the line, Y, Y, is the same as that imparted to it at the line, X, X; or, to express it in another way, the circumferential speed of the disk A is slower at its radius, y, than at its radius, x, and consequently its rotative action on the blank is slower at Y than it is at X, but the circumferential speed of the other disk, B, at its opposing radius, y', is as much greater than at x' as

y is slower than x, so that the mean effective rotative action upon the blank of the smaller and larger radii, y, y', of the two disks respectively is the same as that of the common radii, x, x'. Consequently that portion of the blank lying within the grip of the disks at the line, Y, Y, is rotated at substantially the same speed as that portion at the line, X, X. As this condition prevails in every point in the grip of the disks between the lines, X, X, and, Y, Y, a larger radius and greater circumferential speed of one disk being opposed by a smaller radius and slower circumferential speed of the other, there is practically no twisting of the blank within the grip of the disks by reason of one portion of the blank being rotated faster than another portion. There might, if there were no slippage, be a slight difference of speed of rotation of portions of the blank within the grip of the rolls, due to the fact that the diameter of the blank is slightly smaller at X, X, than it is at Y, Y, but owing to the slippage this does not occur, and the blanks, when they leave the pass between the disks, have their fibres substantially straight and parallel throughout."

This full and clear exposition leaves little to be said, either with regard to the principle of the invention or the mechanical means by which it is sought to be carried out. And it is the mechanical means, of course, and not the method or process—much less the result—that is patented,

and is to be looked to in determining whether infringement exists. The defendants are supposed to escape, because, as it is said, the inventor is confined by the prior art to the precise construction claimed, and has committed himself, in both the converging and diverging lines of the pass, to a plane or flat surface on one disk, opposed to and coacting with a beveled surface on the other, which the defendants, admittedly, do not have. The drawings of the patent lend support to this contention; but they are expressly declared in the specifications to be more or less diagrammatic, and not intended to represent "the exact proportions and relations of the disks and their working surfaces, to be followed under all circumstances"; a reservation which allows of not a little latitude. But, more than this, the controlling and distinguishing feature and principle of the invention consists not so much in having a plane or flat surface—that is to say, one in the exact plane of rotation, at right angles to the axis of the disk—opposed to one that is beveled, converging to, as well as diverging from, the center of the pass, as that at different points, other than the center, the diameters and so the circumferential speed of the disks shall be unequal. It is this counterbalance that preserves the fiber from distortion, and it is secured by the placing and functional relation of the disks, and not by having the opposing surfaces plane or beveled, which merely provides the necessary convergent and divergent lines to draw in and compress the blank. Nor is just what is meant by a "plane surface," except, perchance, as it is contrasted with a bevel, particularly defined in the patent.

The machine in use by the defendants, which is put in evidence, shows each of the disks with a flattened central portion at right angles to the axis; then a slight incline or bevel of about three degrees for the space of some four inches; and then a sharp bevel of ten degrees the rest of the way to the edge; the rolls being so set that the lesser bevel of the one disk is opposite the sharper bevel of the other. It is upon this variation that the defendants rely to escape infringement; beveled surface being opposed to bevel, as it is pointed out, and not bevel to flat, as specified in the patent. But this evidently studious avoidance of the terms, while obtaining the benefit of the principle of the patent, cannot be sustained. Except where form is of the essence of the invention, it has little weight. Machine Co. v. Murphy, 97 U. S. 120, 24 L. Ed. 935. And changes much more significant have been many times held of no importance; the principle and mode of operation being maintained. Ives v. Hamilton, 92 U. S. 431, 23 L. Ed. 494; Elizabeth v. Pavement Co., 97 U. S. 127, 24 L. Ed. 1000; Hoyt v. Horne, 145 U. S. 302, 12 Sup. Ct. 922, 36 L. Ed. 713; Diamond State Iron Co. v.

Goldie, 84 Fed. 972, 28 C. C. A. 589. The spirit rather than the letter governs, having regard to which, the claims in the present instance must be held to be fulfilled by a relatively flat or flattened surface opposed to a bevel; the operative result remaining unchanged. The slight inclination which is given in the defendants' machine to a fractional part of the inner flattened portion of the disks is the full mechanical and functional equivalent of the plane or flat surface called for by the patent, of which it is a mere plausible variation, being hardly distinguishable from it to the eye, and playing identically the same part. By it and the opposing bevel of the other disk the necessary converging lines, to grip and compress the billet, are supplied; and, the two disks being so positioned with respect to each other that the opposite diameters, at different points, whether flat or beveled, are unequal, the distorting effect on the surface of the billet is avoided, which would otherwise be produced. This is the whole principle of the invention, which is thus appropriated bodily; the same mechanical means, substantially, if not literally, being made use of, to carry it out.

It is said, however, that a twist is made by the defendants' machine (which still, as it seems, is claimed as an advantage, because it discloses flaws, and saves the putting out of defective work); and that judged by the product the two machines are not thus alike. The inventor, as it is argued, differentiated his machine in the patent office by the result, and, having so characterized it, and obtained a patent upon the strength of the representations as to what it would do, he is now tied up to a no-twist tube, which, if not produced by the natural operation of the defendants' machine, it does not infringe. But the patent, as already stated, is not for the product, but the mechanical apparatus for making it; and the object to be attained is to be carefully distinguished from the means taken for doing so. And while it is true that the purpose of the invention was to avoid a twist, and it might well be claimed that a machine which was not arranged to, and did not do this, did not come within its scope, where, on the other hand, the mechanism employed is substantially the same, that, for some reason, designed or otherwise, its operative effect is made to vary, cannot be altogether accepted as the test. That is particularly the case, where it is shown, as it has been here, that, if the tubing turned out by the defendants is not what it might be with respect to a twist, it is the result of not doing all with it that might be done. Whatever the form of the machine, in order to do the best work, the mandrel must be set so as to meet and pierce the billet at the narrowest point of the pass, and, if it is not, there will be more or less of a twist, due to the greater resistance of the mandrel when it is withdrawn to a point, where the piercing of the billet is relieved. This is a well-known effect, common to all mills, and within the control of the operator. Being a mere matter of how the machine is run, it does not enter into the case. The patent does not prescribe how or where the mandrel shall be set (except as a preference is expressed for locating the axial line of the pass a little below the center of the rolls), and, if its terms are otherwise fulfilled, it is of no consequence that the mandrel is not so adjusted longitudinally as to bring about the best results. If a perfect or imperfect product is to determine the question, in

any case, infringement would be made to vary according to the skill of the operator, and whether the machine was well or badly run. This is not, of course, the criterion. A misuse, detracting from its utility, does not change the mechanical combination or the essential character of the device. Penfield v. Chambers, 92 Fed. 630, 34 C. C. A. 579; King v. Hubbard, 97 Fed. 795, 38 C. C. A. 423. The mechanism being substantially the same, it is the possibilities that reside in it, under ordinary and proper use, that is to decide; and as to that there can be no question here. The defendants, if they desire, may retract the mandrel, so as to produce a twist, but to do so is a perversion, the natural operation being the other way; and the resultant product, when the machine is correctly and normally run, being the same as that of the complainants, the last pretense for distinguishing it is removed and infringement is made out. This applies not only to the company, but also to the defendant Driscoll, who has been an active agent in promoting the infringement, although not to the other defendants, who are not so involved.

Let a decree be drawn sustaining the patent and finding that it has been infringed, with the usual relief incident thereto, with costs.