## SUNDH ELECTRIC CO. v. GENERAL ELECTRIC CO.

(District Court, N. D. New York. July 29, 1912.)

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—ALTERNATING CURRENT ELECTROMAGNET.

    The Lindquist patents, No. 744,773 and No. 764,608, each for an alternating current electromagnet, and the second being for an improvement on the first by simplifying and lessening the cost of construction, construed, and *held* infringed.

2. PATENTS (§ 241*)—INFRINGEMENT—INFERIORITY OF INFRINGING DEVICE.

    If an alleged infringing device has substantially the same elements as that of the patent, with the same functions, all working on the same principle and in obedience to the same law, and in the same manner and producing the same result, it infringes, although it does not do the work as well or perfectly.

    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 380; Dec. Dig. § 241.*]

---

*For other cases see same top c & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**In** Equity.  Suit by the Sundh Electric Company against the General Electric Company.  On final hearing. Decree for complainant.

Park Benjamin and Alfred Wilkinson, both of New York City, for complainant.

Charles Neave and William G. McNight, both of New York City, for defendant.

RAY, District Judge.  These patents to Lindquist are marked as the Senior patent and the Junior patent, and will be referred to as such or under that name.  The complainant is the owner of both patents.  The manufacture and sale by defendant of the alleged infringing device is admitted.

[1] The defendant denies infringement, and alleges that the patents are invalid in view of the prior art, and for the added reason that Lindquist was not the original inventor, if any invention is shown. The main question is that of infringement, as I am satisfied that the patents are valid and that Lindquist was the original inventor.

The claims in issue of the Senior patent read as follows:

"1. An electromagnet having a plurality of coils symmetrically disposed around a central axis, the individual axis of each of said coils being parallel to said central axis, and means for producing currents of different phase in said coils.

"2. An electromagnet having a cylindrical core and a plurality of symmetrically disposed coils thereon, the said coils having their individual axes parallel to the axis of said core, and means for producing currents of different phase in said coils.

"3. An electromagnet having a cylindrical core, with symmetrically disposed pole-pieces at one end thereof, coils on said pole-pieces and means for producing currents of different phase in said coils.

"4. An electromagnet having a cylindrical laminated core with integral symmetrically disposed pole-pieces at one end thereof, coils on said pole-pieces and means for producing currents of different phase in said coils."

The claims in issue of the Junior patent read as follows:

"1. An electromagnet having a polygonal core and a plurality of symmetrically disposed coils thereon, the said coils having their individual axes parallel to the axis of said core and means for producing currents of different phase in said coils.

"2. An electromagnet having a polygonal core with symmetrically disposed pole-pieces at one end thereof, coils on said pole-pieces and means for producing currents of different phase in said coils.

"3. An electromagnet having a polygonal laminated core with integral symmetrically disposed pole-pieces at one end thereof, coils on said pole-pieces and means for producing currents of different phase in said coils."

It may be said here that the second Lindquist patent is an improvement on the first and simplifies and lessens the cost of construction.

There seems to be three essentials in this electromagnet, viz., the coil, the core, and the armature.  To the coil the energizing current is supplied; the core, an iron body, becomes magnetic when the current passes and the armature is attracted.  It is established that traction electromagnets energized by a direct current have been known and in use for many years, and as the direct current flows in one direction, and constantly and with substantial uniformity, there has been a constant, direct, and unvarying magnetic pull and holding of the arma-

ture. It is a matter of common knowledge that an alternating current, which flows alternately in opposite directions, would not and could not operate in this way, as with an alternating current the armature is attracted and then released in rapid succession, and the result is a constant hammering and chattering—a destruction of parts and unendurable noise. It was therefore a problem to devise an electromagnet which could be efficiently worked with the alternating current. I am satisfied that Lindquist did this, and that his invention went into immediate use and was successful. It is evident that if a unitary magnet core is subjected to the energizing effect of a number of coils, in each of which the reversal of the current occurs at different times, there will be a pull on the armature at all times, a constant pull, and that hammering and chattering will cease. However, it is also evident that the net pull of all the coils must be constant, and in one and the same straight line, and that this line must be coincident with the axis of symmetry of the core. In other words, if the support of or pull on the armature should shift from place to place, there would be more or less hammering and chattering. There must be a constant and uniform pull on all points of the armature in the same and in the proper direction. The patent, therefore, provided the central core with a definite longitudinal axis of symmetry passing through its center, which fixed the line of pull, and the magnet coils were arranged symmetrically around this axis and with special reference to their magnetic effects on the core.

This last, magnetic effect on the core, is of the utmost importance. The currents are of a different phase; when one is pulling and another is not. Kennelly, complainant's expert, describes the Senior patent in suit in detail, but sums up the mode of organization of the same as follows:

"A central axis, or axis of symmetry, and around this axis are placed a plurality of coils. The coils are to be disposed symmetrically with respect to this axis, and the symmetry is to be such that each of said coils has an axis and each axis is parallel to the said central axis or axis of symmetry of the whole; that is, I understand that, of all the possible types of symmetrical arrangement about an axis which may theoretically exist in such a structure, that particular disposition is to be employed which involves the parallelism of the axis of each of the plurality of the coils with the axis of symmetry of the whole."

I do not think the geometrical arrangement of the magnet coils about the axis of much importance. The claims call for a symmetrical disposition of the coils around a central axis. That degree of symmetry and geometric arrangement was necessary which would secure a substantial degree of uniformity in the direction and magnitude of electromagnetic attraction upon the armature under the conjoint action of out of phase electric currents. Constant and uniform pull on the armature was the main and controlling idea.

Claims 2, 3, and 4 of the Senior patent call for an electromagnet having a "cylindrical core," but claim 4 says "cylindrical laminated core," and claim 1 has a central axis around which the coils are disposed. Means for producing currents of *different* phase in the coils, and coils are essential elements of each claim; but no specific method

of winding and connections are claimed or essential, and any method may be adopted which will produce different phases. We have as the main feature a single solid laminated mass, with pole-pieces so formed therein that a substantially uniform distribution of symmetrically balanced magnetic forces results. These magnetic forces, as I have said result, in a mechanical pull constant in strength, direction, and point of application. The patent involved a proper conception of the relation of things and their utilization when brought into proper relation.

The defendant's switch, the alleged infringing device or structure, has the alternating current traction electromagnet to control the opening and closing of switch contacts disposed in circuit. The defendant's electromagnet structure has a large fixed coil, an armature in elongated or plunger form, and, when this fixed coil is energized, the armature is drawn into that coil, which is composed of a number of flat plates or laminations laid face to face. Two flattened copper rings, which defendant's expert, Mr. Hawkins, speaks of as shading coils, and each of which is a closed coil of one turn, respectively inclose pole-pieces which are formed by cutting grooves in the end of the armature and these grooves receive the rings. The switch mechanism to be operated by the movement of the armature is attached to the end thereof opposite the end which carries the two copper ring coils. In this structure three coils are operating on the plunger, one of which is fixed axially with respect to the plunger, but is not rigidly attached thereto, and the others are connected with the plunger both axially and rigidly. It cannot well be denied that these three coils are symmetrically disposed around the longitudinal axis of the fixed core, and that this is the axis of symmetry of the system. Complainant states it this way:

"These three coils are 'symmetrically disposed around the longitudinal axis of the fixed coil, which is also the axis of symmetry of the system.' The fixed coil is symmetrical to that axis, because that axis passes through its center, and the single ring coils on the plunger are symmetrically disposed around that axis, 'because they are disposed at equal distances from the central axis of the plunger, which plunger is placed symmetrically inside the fixed coil.'"

It is evident, from the very brief references made, that there are structural differences between the defendant's structure and that of the Lindquist Senior patent. But change of construction does not avoid infringement in a patent as broad as this. The two coils on defendant's armature are copper rings of one turn, and not spirals of several turns; but the one is the equivalent of the other in mode of operation and results, if the electrical current is of sufficient strength. In the structure of the Senior patent the coils are all supported on pole-pieces which project from the stationary coil. Defendant's structure has its large fixed coil stationary, and the two copper ring coils on pole-pieces on the armature—plunger. The complainant's expert, Prof. Kennelly says this is purely structural, and will not affect the principle or mode of operation of the apparatus as described. I fail to find proof to the contrary. In defendant's structure the copper ring coils are disposed opposite each other and equidistant from

the axis, but the fixed coil surrounds the axis. It seems to me that this plurality of coils have their axes parallel to each other and to the central axis of the device. On this subject the complainant's expert says:

"I consider that the circular symmetry called for is such as corresponds to an initial clock face arrangement of poles disposed at equal angular distances around the dial, but with any length of diameter permitted to any diametral opposite pair, including the limiting case when such a pair has vanishing separation, or resolves itself into a single pole at the center. If, therefore, in the arrangement of Fig. 6 of the senior Lindquist patent, one pair of opposite poles is pushed nearer and nearer together, until they meet as a single pole in the center, I consider this would be retaining the circular symmetry called for in the patent as a limiting case, and it would disclose three poles in a straight line, all forming part of a unitary core structure, each parallel to the axis of symmetry, and each pair—regarding the central pole as the equivalent of a pair—being symmetrically disposed with respect to the axis. Such an arrangement would act, in the manner described in the patent, to produce substantially constant pull without chattering, by reason of a substantial uniformity of the resulting magnetic attraction in strength, direction, and point of application."

He also says:

"'In the defendants' switch,' says Professor Kennelly, 'it is my opinion, unquestionably, that the fixed coil is located on the plunger core in the sense that it is not off or away from the plunger core. It is "on" in the sense of surrounding the plunger core and operating upon it. It is not on the plunger core in the sense of being rigidly attached to that core. It is "on" the plunger core as that term is used in describing electromagnetic mechanism.'"

It seems to me that defendant's structure shows (1) an electromagnet having a fixed and a movable element; (2) that in such magnet we have a plurality of coils; (3) that these coils form a symmetrically disposed system with respect to the central axis of the apparatus. Each of the three coils has an axis of its own, and then there is the central axis, and all are parallel to each other. Alternating currents flow in these coils, and these currents are of different phase; that is, the alternating current in the fixed coil is of a different phase from that in the single-turn coils which are, as I understand, of the same phase. So far as I can see or understand, the whole operates to produce a steady, uniform pull in one and the same direction, and hold the armature, and so prevent the pounding and chattering before referred to. Claim 2 of the Senior patent calls for (1) a cylindrical core with a plurality of symmetrically disposed coils thereon, the individual axis of which must be parallel to the axis of such core. There must be, also, means for producing currents of different phase in said coils. The core of the Lindquist Senior patent has or carries pole-pieces which carry the coils. In defendant's device the plunger carries the two copper ring coils.

Mr. Hawkins, for the defendant, points out some 21 different propositions, or differences between Lindquist and defendant's device, which he claims show noninfringement. The most of them go to mere differences in structure, and have no bearing on design and operation. There seem to be three known equivalent methods of producing currents of different phase in magnet coils. If we have two generators,

and from each supply a current, the one differing in phase from the other, and carry each of such currents over a different circuit to a different coil to energize same, we necessarily have a current of different phase in each coil. If we have a single generator, and produce therefrom a single alternating current in one circuit, and then split the circuit into two branches, each branch having a coil, but place resistance to the current in one branch, and not in the other, we necessarily have a different phase, as it takes time for the current to pass the obstruction. If, now, we have a single generator, delivering a current to a coil in a single circuit, but we place a second coil, closed on itself, close to the coil in the circuit, the current will induce another current in the second coil, and this will be out of phase with the coil in the circuit. These are the direct, split-phase, and split-phase inductive methods respectively. The use by defendant of a different method from those shown by Lindquist in his drawings does not avoid infringement. Lindquist did not limit himself to any method of producing the currents of different phase in the coils. I think, therefore, that these differences are of no essential moment. This applies to propositions 1, 2, 5, 6, 7, 9, 10, 12, 15.

Defendant contends that "means" for producing currents of different phase in the coils are not found in the defendant's alleged infringing device. On this subject Mr. Kennelly testified that he did find such means, and detailed them, referring to the drawings of defendant's device, as the alternating current mains supplying the fixed electromagnet coil, the fixed coil cross-sectioned in black and white, the two single ring coils on the plunger, the arrangement of the magnetic circuit of the apparatus, and the location and arrangement of the three coils, whereby, he says:

"Not only are their axes parallel to each other and to the axis of symmetry of the whole, but also whereby means are produced for setting up electric currents and magnetic fluxes differing in phase for the purposes described in the patent in suit."

If means for producing currents of different phase in the coils are wanting, I am unable to understand why defendant has currents of different phase in the fixed coil and the ring coils, and the results that follow from their presence. The court is, of course, bound to follow the credible evidence in the case, and on a subject like this, when experts disagree, to an extent, at least, is liable to go wrong, as are the experts themselves. Hawkins seems to think that the Senior patent in suit is limited to a source of supply of out of phase current external to the magnet, but connected to the windings through leads to the coil terminals. If defendant's device has the three coils arranged according to the patent in suit, and one, the large one, is directly connected with the generator and surrounds the plunger, which carries the smaller coils, and these are actuated by induction, or the split-phase inductive method, can it make any difference so long as the large fixed coil is of a different phase from that of the copper ring coils? If Lindquist's claims had called for the "means for producing currents of different phase in said coils" shown and described in his drawings, there would be a limitation in the claims themselves which is not now

found there, and which I do not think should be read into them, and which would probably avoid infringement. Even if the Lindquist patents are valid as an advance on the prior art, and even if defendant's device infringes the Lindquist claims, broadly construed, still, if the defendant's device is strictly in accordance with the prior art (it being conceded that it differs from Lindquist considerably in construction and somewhat in its mode of being operated and operation), there is no infringement; that is, defendant does not infringe the Lindquist claims properly construed in the light of the prior art.

Considerable has been said as to the Ihlder patent for alternating-current magnet, dated May 30, 1905, No. 791,423, application filed July 31, 1903, divided and application for the particular patent filed December 2, 1904, and also as to the Ihlder patent of January 17, 1905, No. 780,104, application filed July 31, 1903, for electro-controlling apparatus. Lindquist filed his application for the Senior patent in suit July 14, 1903, and I find no satisfactory evidence that Ihlder can be carried back of Lindquist in knowledge even. The Schuckert and Imray patents are in this art. The Schuckert patent (German) of May 1, 1902, No. 130,293, shows a two-phase and a three-phase tractive magnet of which he says:

"The subject of the present invention consists in an arrangement of tractive magnets for multiphase currents which eliminates the disturbing noise which occurs in the magnets heretofore known."

After stating that in any case the armature of such a magnet must be guided parallel, he says:

"The present invention offers a method permitting the avoidance of the appearance of such disturbing couple of forces; i. e., the construction of multiple magnets operating noiselessly. This purpose is substantially obtained in that the tractive force generated by each single phase passes through the point of application of the load. In consequence thereof, the resultant of all tractive forces generated by the collective phases will always pass through the point of application of the load, and disturbing couples of forces cannot occur."

He then describes an arrangement whereby these alternating-current magnets—with two-phase current only two alternating-current magnets are firmly placed vertically one above the other, and three corresponding armatures directly under such magnets, respectively, are rigidly connected together by a rod. He says:

"If the three alternating-current magnets are fed in star or triangular connection, with triphase current, a variable tractive force will be exercised on each of the three armatures. The resultant of the three forces is, however, almost constant, and it always passes through the point of application $h$ of the load, a fact which is especially to be emphasized."

It is evident that, aside from the idea of a parallel guidance of the armature and that the "resultant" of the three forces must pass through the "point of application of the load," this is not complainant's patent or invention.

The patent referred to also says:

"Instead of placing the magnets one over the other, the pole surfaces of same may be arranged in a plane, as in Figs. 2 to 7, in which case a common magnetic yoke may be advantageously arranged for the magnets as well

as for the armature. It is a characteristic feature of this arrangement that the poles produced by each phase are always arranged in pairs about the point of application of the load, and are excited in the same manner as an ordinary continuous current horseshoe magnet. However, the magnets according to Figs. 5 and 7 form an exception, a single pole being arranged for one of the three phases. As, however, this pole lies vertically over the point of application of the load, no couple of forces can be formed by the tractive force thereof.

"Figs. 2 and 3 show such a magnet for triphase current. It possesses six polar projections, of which two always are placed diametrically opposite each other (*I–I*, *II–II*, *III–III*) and are fed by one phase. Fig. 4 shows the same arrangement for a two-phase magnet. Fig. 5 illustrates a five-pole magnet for triphase current. In this arrangement the poles *II–II*, *III–III* are again arranged in pairs, and their coils are connected in series. The first phase, however, feeds only one, viz., the middle pole, which lies vertically under the point of application of the load, and possesses advantageously a double cross-section, so that the central tractive forces of the poles, *I*, *II–II*, and *III–III* are of the same amount.

"In order to facilitate the construction in the arrangement according to Fig. 6, two triple-pole magnets are firmly connected together. The excitation of the three-pole pairs results in such a way that the resulting tractive forces of the poles *I–I*, and also of the rest of the pole pairs, passes through the point of application *h* of the load."

The drawings indicate a center around which the coils, whether four or six, are symmetrically arranged, and the armature has four or six (as the case may be) corresponding projections or poles, which, as illustrated, meet corresponding projections of the magnets on which the coils are placed. The laminations of the pole-pieces are at right angles to those of the core. The claim reads:

"Tractive magnets for multiphase currents, characterized by a central or pair arrangement of their poles, in such a way that the tractive forces generated by each phase pass through the point of application of the load for the purpose of avoiding the disturbing couples of forces which might occur through the action of force and load on the armature and for obtaining a noiseless action of the magnet."

Without going into detail, I am satisfied that Schuckert differs very materially from Lindquist, and that from the German patent and drawings it would be practically impossible to make an operative device in accordance therewith. It suggests, but does not teach or instruct one how to do what is suggested. I have no doubt, and the prior art demonstrates, that it was understood that an electromagnet operated by alternating currents would draw and hold its load without vibration or chattering, if means could be devised by which all parts of the armature should be pulled or lifted and held by the same force or equally at all times in one and the same direction, and we may say the point of application of the load. Any electromagnet which failed in this was defective in arrangement and operation. The Lindquist patent says:

"The invention relates to an electromagnet constructed to be energized by an alternating current, and when so energized to attract its armature and hold the same in position by substantially constant pull and without chattering. The invention consists in an electromagnet having a plurality of coils symmetrically disposed around a central axis, the individual axis of each of said coils being parallel to said central axis; also in the construction more particularly hereinafter set forth."

And later the patent says:

"In all cases it will be noted that the axes of the coils are always parallel to and symmetrically disposed around the axis of the cylindrical magnet core."

Claim 1 says nothing of a "cylindrical core," claims 2 and 3 call for a "cylindrical core," and claim 4 calls for a cylindrical laminated core with integral symmetrically-disposed pole-pieces at one end thereof, coils on said pole-pieces, and "means," etc. I fail to see that defendant does not infringe each and all of these claims. Clearly there is an electromagnet, and clearly it has a plurality of coils symmetrically disposed around a central axis, and as clearly the individual axis of each of said coils is parallel to the central axis. And I can, I think, understand the necessity or great value of the parallelism of the axes of the coils. It means much more than merely mechanical parallelism, for it involves an equal distribution of the magnetism. As I understand, if the core is not laminated, there is danger and imminent danger of so-called parasitic or Eddy currents. If we would have a symmetrical distribution and operation or effect of the magnetism, we must have a symmetrical and like construction and quality of the elements through which it is to operate or be distributed. When defendant surrounded its laminated armature (surrounded when drawn in) with the large fixed coil, and energized it, the consequence was that the copper ring coils were energized and the armature drawn into the large fixed coil. When the core, armature, with its two symmetrically-disposed laminated pole-pieces carrying the two single-turn copper coils, is energized, the large fixed coil inducing current in the ring coils, we have the structural and magnetic equality and symmetry required. The lamination of the pole-pieces on the end of the armature which carry the copper ring coils are integral with the armature, a part thereof, and consequently parallel with the central axis. I cannot see why every condition of the patent in suit is not fully met by the defendant's structure. It is said that the movable plunger is not cylindrical geometrically. This is true. But functionally it is cylindrical. To all intents and purposes it is cylindrical. For all the mechanical and magnetic purposes of defendant's device it is cylindrical. It moves up and down in the cylindrical space within the large fixed coil. There are several cases which hold that such a change of shape, the function being the same, does not avoid infringement.

Hawkins contends that the "core" of Lindquist is the body *A* from which the pole-pieces extend and which in turn support the coils. This is true enough. He then says:

"The portion of defendant's structure which corresponds in function to this core *A* is the rectangular box-like iron member which is stationary and surrounds the main coil. This member obviously is not cylindrical."

If this box-like structure referred to by Mr. Hawkins does perform the functions, and all the essential functions, of the core of the Lindquist patent, then it is so far from cylindrical that, if "cylindrical" is of any importance at all, defendant does not infringe. But

in my judgment this box-like structure serves as a mere support for the real core of the defendant's structure. He says:

"Dr. Kennelly, in reading this claim on defendant's structure, calls the plunger of defendant's structure the 'core.' It does not seem to me that this is a proper interpretation, because defendant's plunger corresponds more nearly to the armature pole-pieces 24 of Lindquist, which move up and down inside the coils just as defendant's plunger moves up and down inside the main coil, and these pole-pieces in Lindquist's structure are not cylindrical, and are not the parts referred to by the term 'cylindrical core' in the claim. Even if defendant's plunger could properly be called the 'core,' as this word is used in the claim, it could not be called a cylindrical core without further interpreting 'cylindrical,' as Dr. Kennelly does, as 'functionally cylindrical.' As I have explained heretofore, the shape of the core has nothing to do with its function, so that interpreting cylindrical as 'functionally cylindrical' is simply reading the word out of the claim."

I cannot agree with this when we consider the function of the Lindquist core as described in his specifications. He also says:

"I do not agree with Dr. Kennelly that defendant's coils—the large one with its axis coincident with the axis of the magnet, and the two small coils being on opposite sides of the central axis and inclosed by the large coil—are properly described as 'symmetrically disposed around a central axis,' when that clause is read in the light of the specifications and drawings of the Lindquist patent."

[2] It is true that Lindquist's *drawings* do not show such an arrangement of the coils, but all he had to do was to show one mode of arrangement. The claim embraces all arrangements of the coils which will symmetrically dispose them about the central axis. Mr. Hawkins also contends that defendant's device will not do the work of complainant's device as well or as perfectly. This is immaterial. If substantially it has the same elements with the same functions, all working on the same principle and in obedience to the same law, and in the same manner and producing the same result, although imperfectly, defendant infringes.

The defendant infringes, and there will be a decree accordingly for an injunction and for an accounting, with costs. Defendant is amply responsible, and pending an appeal, if taken within 30 days from the entry of the interlocutory decree, the issue and operation of the injunction will be suspended, on condition that defendant shall keep an account of all infringing devices made and sold or made or sold, open to inspection once each three months.