**AUDITORIUM CONDITIONING CORPORATION v. ST. GEORGE HOLDING CO. et al.**

No. 6556.

District Court, E. D. New York.

June 29, 1933.

Duell, Dunn & Anderson, of New York City (Clifford E. Dunn, Herman Seid, and David S. Kane, all of New York City, of counsel), for plaintiff.

Alexander Kahn, of New York City, for defendants.

CAMPBELL, District Judge.

This action is brought to obtain relief by injunction and damages for the alleged infringement of reissue patent No. 16,611, issued to Leo L. Lewis, assignor to Carrier Engineering Corporation, for method of and apparatus for cooling and ventilating, granted May 3, 1927, on application for reissue filed February 12, 1927, original No. 1,583,060, May 4, 1926, original application filed December 22, 1924, and of patent No. 1,670,656, issued to Walter L. Fleisher, assignor by mesne assignments to Auditorium Ventilating Corporation, for ventilating system, granted May 22, 1928, on an application filed May 20, 1927.

Both of these patents relate to methods and apparatus for conditioning the air in auditoriums, theaters, and similar places in which a considerable number of people assemble.

The plaintiff, Auditorium Conditioning Corporation, a New Jersey corporation, which changed its name from Auditorium Ventilating Corporation, has title to both patents.

The defendant St. George Holding Company, a New York corporation, is the owner, and the defendant St. George Amusement Company, a New York corporation, is the op-

erator, of a theater in the Eastern district of New York, called the St. George Playhouse, which contains an air-conditioning system put into operation subsequent to the issuance of said patents in suit, after notice and prior to the filing of the bill herein, and continuously operated from that time on.

The problem that confronted Lewis and Fleisher, of air conditioning for human comfort, was very different from the so-called air conditioning for industrial purposes, in which the factors of moisture and heat are always known, and the system can easily be operated either to add moisture, add heat, or to remove heat or moisture, according to a predetermined plan. The materials processed constitute the real load; the people in such a plant usually being a negligible factor.

The prior art in the main deals only with industrial systems.

In air conditioning for human comfort within a public inclosure such as a theater or the like, the factors of moisture and heat are not always known, as the people to a preponderant degree constitute the heavy load, and this is an uncertain load which cannot be estimated, due to the constant shifting of audiences.

The people may arrive in large numbers and pack the theater to capacity at some time during the day, while at another time the theater may be almost empty.

This, however, while the dominant, is not the only, difficulty, as changes in weather have some effect on the load, and each person gives off heat and moisture, and also gives off odors which in the aggregate become seriously objectionable. The quantities of heat and moisture given off differ with different people, and the variations in temperature and humidity do not follow the same curves.

The heat and moisture given off by individuals tend to raise the temperature and absolute amount of moisture in an atmosphere, but the relative humidity will actually fall, since the heat given off is proportionately greater than the moisture exuded.

The human organism is extremely sensitive to atmospheric conditions, and, to be considered comfortable, the humidity in the air must not be oppressive, the air motion must create a pleasant effect without excessive evaporation from the skin, and there must also be an absence of streaks and drafts.

In addition, the temperature and moisture must be correlated with the air motion, or the air at comfortable temperature with too much moisture would feel hot and muggy, or the

same air with too little moisture would increase evaporation and feel cold, as it would tend to dry the membranes of the nostrils and throat, which would be physically injurious.

Attempts were made to solve the problem prior to the dates of invention of the patents in suit, but in all of them all of the air was treated, and, if any reheating of cold air was accomplished, it was by means of heating devices, usually requiring the use of a steam boiler under summer conditions, which was objectionable.

The patentees of the patents in suit taught the art that all the air need not be treated, and that mechanical reheaters could entirely be eliminated and comfortable conditions produced at a reasonable cost despite the quantities of air handled.

Both of the patents in suit have a primary fourfold object in view:

First, to provide for producing and controlling atmospheric conditions in an inclosure by means of a system wherein only part of the air is conditioned, instead of all of it.

Second, to provide a system where the need for mechanically reheating the dehumidified air is entirely eliminated. Thus, although air is chilled to a low temperature in order to produce desired dehumidification, that air is introduced into the inclosure at a higher and comfortable temperature, yet no mechanical reheaters are employed.

Third, to provide a system wherein the same volume of air may at all times be introduced, even though the constituent proportions of dehumidified air and other air are varied, so that equable conditions may be maintained throughout the theater and fluctuations in temperature be limited to a degree or two.

Fourth, to enable such systems to be installed and operated at a reasonable cost.

Large quantities of air are used by both of the patentees of the patents in suit in achieving these objects.

This is also true of the St. George Playhouse of the defendants, in which about 33,000 cubic feet of air per minute is used, and was true of the adjudicated Rochester system, in which about 108,000 cubic feet per minute were used.

An appreciable part of the air so used in both inclosures was recirculated air, or air which is reused without conditioning.

Recirculated air is in practice often called "bypassed" air, due to the fact that it bypasses the conditioner instead of passing through it, and mixes at the outlet end of the

conditioner with conditioned air discharged from the conditioner.

This bypassing seems to me to be the gist of both of the patents in suit.

Lewis states that his invention relates to air conditioning of rooms where people congregate, such as theaters; that it is desirable to maintain a relative humidity preferably not greater than 50 per cent.; that it is essential to keep the air circulating in order quickly to absorb heat and moisture from the bodies and the exhalations of the people; and that he avoids first cooling the air to dehumidify it and then heating it up again by mechanical means, which would require the operation of a boiler in summer, by a new arrangement which contemplates bypassing. He states his primary object is to provide a cooling system "in which the bulk of the air is recirculated without being conditioned."

Only a small part of the air is taken from outside and conditioned; this small part being mixed with the recirculated or bypassed air, "thus saving in refrigeration and eliminating the necessity of means for reheating the air during the summer months."

The working of the Lewis system is shown in Exhibit 8, in which outside air under control of damper A, comprising less than one-third of the air handled by the system, is cooled in the conditioner to a point where its excess undesirable moisture is squeezed out, and leaves the conditioner saturated at a low temperature, too cold for comfort. If it entered the theater in this condition without reheating, the occupants would be exposed to dangerously cold air. However, in emerging from the conditioner, the cold conditioned air meets a large volume of air returning from the theater.

This air, which in practice comprises about two-thirds or more of the air handled by the system, is the recirculated or bypassed air under the control of damper C, which is used for reheating the cold conditioned air. The cold conditioned air and the bypassed air then mix in the mixing chamber before being discharged by the fan into the theater. Some air from the theater is released to the outer atmosphere under control of damper B. The fan operates at constant speed, and not only draws outside air into the conditioner through damper A, and air from the theater through damper C, but discharges the mixed air from the mixing chamber into the theater.

Since it operates at constant speed, it always delivers the same amount of air into the theater, so that circulation requirements of thirty cubic feet per seat may always be maintained. The constituent parts of conditioned air and bypassed air may be varied, so that, when the theater temperature seeks to rise, more cold air from the conditioner and less bypassed air will be mixed for delivery to the theater, but, if the condition in the theater calls for greater reheating, less air will be taken through the conditioner and more will be bypassed from the theater.

The bypassed air is higher in temperature than the cold conditioned air due to the people in the theater who are giving off heat, to infiltration of heat through walls, etc., and to heat given off by lights, motors, and other apparatus.

The bypassed air is lower in relative humidity than the cold, dehumidified air, which is saturated or at a 100 per cent. relative humidity, because relatively a human being gives off more heat than moisture, so that, although the amount of moisture in a theater, all things being equal, would continually tend to add up, yet, relatively, the percentage of humidity compared to saturation tends to diminish, due to the heat given off by the people, and that added because of hot outdoor climate, from the lights, etc.

Lewis perceived that, due to this phenomenon, air in a theater was a perfect reheating agency, which could be mixed with the conditioned air for raising its temperature and lowering its relative humidity, and therefore conditions but a small percentage of the total air, and recirculates or bypasses a large volume, which reheats the conditioned air and eliminates the necessity for steam reheaters under summer conditions.

Lewis has a dew point control which may be set at any desired point, and fixed the temperature of the spray of water in the conditioner. The outside air entering the conditioner will thus be reduced in temperature by the cold sprays to a point depending upon the setting of the control. A hygrostat D responds to relative humidity which is a function of temperature, and controls operation of dampers A, B, and C. This hygrostat is in the return duct leading from the theater to the mixing chamber, and, since the movement of air is very rapid, it responds almost immediately to changes in condition within the theater.

Thus, as theater conditions vary, the hygrostat will cause the dampers to operate so that more or less air is conditioned and bypassed.

If more conditioned air is required, the hygrostat will cause damper A to open more

widely and bypass damper C to close somewhat; whereas, if the theater tends to become a bit too cool, the reverse action will take place. The bypass damper, in any event, will never close, so that the conditioned air will always be augmented in volume and reheated by a sufficient volume of bypassed air.

Lewis shows a positive relief duct, but in practice relief may take place either through an exhaust or through any desired opening in the theater.

While the system is designed for all year round, and winter conditioning equipment is provided, the winter heating arrangement forms no part of the bypassing system for summer operation primarily covered by the invention.

Fleisher went further than Lewis, in that he taught that, while some outdoor air should be taken in at all times, the total quantity of cooled and conditioned air desired for mixing with recirculated air could with advantage be composed of a portion of outside air and a portion of washed and cooled air from the room, thus saving the large difference in cost arising from the difference in condition between the inside and outside air.

He provided for intaking that minimum of outdoor air required for physiological reasons, and the prevention of odors, and supplied an additional quantity as was required for conditioning from the theater itself.

Fleisher sends outside air and theater air to the conditioner, but Lewis sent outside air alone to the conditioner.

There is an appreciable saving in Fleisher over Lewis.

Fleisher as well as Lewis usually conditions less than one-third of the air handled by the system.

Fleisher was faced with the problem that, if air from the theater were sent to the conditioner, there to be dehumidified with outdoor air, and other return air were bypassed beyond the conditioner, the volumes of theater air sent to and beyond the conditioner would have to be proportioned. He therefore took a further step forward and arranged to proportion the return air from the theater, so that the amount going to the conditioner, as well as the amount bypassing the conditioner, would vary, responsive to the fluctuations in theater conditions.

He discovered that, if theater air going to and around the conditioner were subject to the usual constant fan suction, and the openings admitting this return air were variably controlled, a correct volume of return air

drawn beyond (bypassing) the conditioner would correspondingly insure a correct volume of return air being drawn through the conditioner.

Fleisher's proportioning of return air to and beyond (bypassing) the conditioner coincidently regulates both temperature and humidity with an eye to maximum economy and the coincidental varying of outdoor, return air to the conditioner and bypassed air volumes makes for a maximum flexibility regardless of the wide fluctuations in conditions within and outside the theater.

Fleisher's system also enables speedy cooling down of a theater before patrons are admitted and before any outdoor air is needed.

Lewis' system would require expensive conditioning of hot outdoor air in the summertime.

Fleisher's system does not require, before the theater is opened, the conditioning of outside air, but the air from the theater may be returned to the conditioner over and over again and the cooling down effected prior to the opening of the theater, at a very little cost.

The return air in Fleisher's system supplements the quantity of outdoor air required for physiological reasons when the theater is open, which very often is a relatively small amount. The outside air, therefore, requires less conditioning, and therefore a smaller conditioning apparatus may be employed, which is an advantage.

The working of the Fleisher system is shown in Exhibit 7, which shows the bypass duct with damper D, which corresponds to Lewis' bypass duct with damper C shown on Exhibit 8. The outdoor air is admitted to the conditioner under control of damper E. Return air from the theater, under control of damper C also goes to the conditioner. The outdoor air plus return air is dehumidified and leaves the conditioner cold but saturated. In the mixing chamber, at the outlet end of the conditioner, this cold air meets a large volume of bypassed air from the theater. This bypassed air is under control of damper D, and in mixing with the conditioned air raises its temperature, as well as lowers its relative humidity. This mixture is then delivered by the fan to the theater.

When the theater requires more cooling, more air is taken through the conditioner and less bypassed, whereas, if a higher temperature is required, more bypassed air is fed to the mixing chamber and less delivered from the conditioner.

Fleisher uses a thermostat A, which is located in the return duct.

The rush of air from the theater affects this thermostat so that it responds to changes in conditions within the theater. Under summer conditions thermostat A governs damper D, which controls the amount of return air bypassing the conditioner. The return air from the theater is divided into two streams. One stream goes past damper C to the entrance end of the conditioner, whereas the other stream, of greater volume, bypasses the conditioner and goes directly to the mixing chamber, where it meets the cold, saturated air emerging from the conditioner. If more conditioned air is required, damper D will tend somewhat to close, whereupon less return air will be admitted to the mixing chamber, and hence more air will go to the conditioner. If the temperature in the theater tends to fall and reheating is demanded, damper D will tend to open, whereupon more return air will be bypassed and less go to the conditioner. By the manipulation of damper D under control of the thermostat, the proportions of return air admitted to the conditioner and bypassing the conditioner are controlled responsive to fluctuations in atmospheric conditions in the theater. The fan draws a constant amount of air and supplies this air to the theater, and the shifting in position of damper D will not only vary the proportions of return air admitted to the conditioner, and bypassing the conditioner, but also controls the amount of outside air entering the conditioner, as the air takes the path of least resistance, and there is comparatively little resistance to the entrance of bypassed air to the fan, whereas there is considerable resistance to the entrance of outside air because of sprays, cooling coils, eliminators, etc., in the conditioner.

When damper D tends to open and allow more return air to bypass the conditioner, it will not only cut down the amount of return air which enters the conditioner, but also the amount of outside air which enters the conditioner.

A wet bulb thermostat B is provided for governing the temperature of the conditioner spray water in the summertime, and of a preheater in the wintertime. It is unnecessary to discuss the winter appliances.

The commercial success of the two patents in suit is shown by their acceptance by the theater world.

Defendants' system installed in the St. George Playhouse (Exhibits S. G. 5 and S. G. 6) shows that outside air is admitted to the front end of a washer or conditioner 10, and is drawn through the conditioner by the suction of fan 12. Return air enters chamber 16 at the front end of the conditioner or washer 10, and is also drawn through the conditioner. Return damper 2 and fresh air damper 1 are hand-controlled. Bypass damper 4 is automatically controlled and admits return air directly to bypass passage 14, which bypasses the conditioner. This return air comes from the theater. The bypass damper responds to a control instrument, and serves to admit more or less return air, which bypasses the conditioner and goes directly to the fan. All of the elements of the patent in suit are present; outside air being conditioned, return air being conditioned, and return air bypassing the conditioner for mixture with conditioned air, so that a greater volume of air will result, higher in temperature than the conditioned air and lower in relative humidity. The fan is operated at constant speed, and, due to the variations in position of bypass damper 4, the proportions of conditioned air and unconditioned bypassed air will be varied.

The bypass damper responds to the thermostat which is in the theater, and controls the proportioning of the different volumes of air responsive to fluctuations in condition in the theater.

The manner of control is that of the patents in suit. Heaters are used in winter just as in the patents in suit.

As in the patents in suit, the bypass dampers in defendants' installation are always partly open and never closed, as the reheating of the cold, conditioned air is constantly required, and, if the bypass damper were to close even for an instant, a cold blast of air would immediately be delivered by the fan, to the discomfort of the patrons and the disruption of comfortable conditions.

The patents in suit read on the defendants' structure, the prime objects of the patents in suit are achieved, and the instrumentalities disclosed by the patentees, as well as the manner of employing these instrumentalities, is completely embraced in the defendants' structure.

Plaintiff relies upon claims 1, 3, 5, 13, and 14 of the Lewis patent in suit, and claims 1, 13, 14, 17, and 20 of the Fleisher patent in suit, all of which were held to be valid and infringed in the said Rochester suit.

Claims 1 and 14 of the Lewis patent in suit, and claims 1 and 13 of the Fleisher patent in suit, may be deemed typical and read as follows:

"1. The method of ventilating an enclosure in which people assemble, which includes withdrawing air from said enclosure, conditioning fresh air to provide air having a dew point lower than the dew point of the withdrawn air, mixing said conditioned fresh air with air withdrawn from the enclosure and delivering the mixed air to the enclosure, and varying the proportions of said fresh air in the mixture in accordance with changes in the number of people in the enclosure."

"14. In an apparatus for ventilating and providing desired atmospheric conditions in an enclosure in which people assemble, the combination with said enclosure of means for permitting relief of air therefrom in restricted quantities, an air dehumidifier having an inlet for outside fresh air, a mixing chamber in communication with the outlet of said dehumidifier, means between said mixing chamber and the enclosure for causing fresh air to be drawn through the dehumidifier and mixing chamber and insuring the delivery thereof into the enclosure and also for returning air from the enclosure to said mixing chamber wherein it is mixed with the dehumidified air passing therethrough, and means for varying the admission of fresh air to said dehumidifier." Lewis patent.

"1. The process of ventilating and conditioning a room, which includes withdrawing air from the room, mixing fresh air with withdrawn air, conditioning said mixture, adding withdrawn air having a condition different from the conditioned air to said mixture after conditioning and adjusting responsive to air conditions in the room the proportions of conditioned air and withdrawn air to vary the humidity in the room."

"13. In an apparatus of the character described, in combination, means for feeding air to an enclosure, means for conditioning said air, means for supplying fresh air and return air for conditioning, means for diluting the conditioned air with recirculated air, and means responsive to the temperature within the room for varying the quantity of such recirculated air." Fleisher patent.

■ Without going into a detailed description of the structure found to infringe in the Rochester suit and comparing it with defendants' structure, it is sufficient to point out that the heart of the patents in suit, the bypass, is found in the defendants' system just as in the Rochester system, which was held a complete infringement.

Defendants are not relieved from infringement because they contend that, in the patents in suit and in the Rochester Theatre, the operation of the system is accomplished by a greater amount of automatic control, and it is also accomplished by the placing of additional instruments than those shown in defendants' structure. Additional controls such as the dew point and wet bulb controls, respectively, in the patents in suit, may be advantageously used, but neither the claims in suit nor the bypass feature are directed nor are linked with such added instruments.

■ Defendants cannot avoid infringement merely by eliminating devices which form no part of the invention. Walker v. Lakewood Engineering Co. (D. C.) 14 F.(2d) 333, affirmed (C. C. A.) 23 F.(2d) 623; Parsons Non-Skid Co., Limited, v. Atlas Chain Co. (C. C. A.) 198 F. 399; Davis v. Perry (C. C. A.) 120 F. 941; Johnston v. Davenport Brick & Tile Co. (D. C.) 237 F. 668; Marconi Wireless Telegraph Co. v. De Forest Radio Tel. & Teleg. Co. (D. C.) 225 F. 65; Westinghouse Elec. & Mfg. Co. v. Royal-Eastern Elec. Supply Co. (D. C.) 9 F.(2d) 397.

Infringement is not avoided if the alleged infringing mechanical device lacks one of the functions of the patented device, where such function is not claimed in the patent. Alaska Packers' Association v. Letson (C. C.) 119 F. 599; Id. (C. C. A.) 130 F. 129.

That the thermostat in the defendants' theater is placed in front of the balcony while in the patents in suit it is shown in return ducts, and in the Rochester Theatre it was placed in a collecting chamber in the basement and not in return ducts, is immaterial, as the patents in suit do not limit themselves to any particular position where the control need be placed, and the movement of the air is so rapid that the thermostat will respond to the changing conditions in the theater, whether the thermostat is in the theater or in ducts leading from the theater.

Even if it were a fact (which it is not) that the thermostat in the defendants' theater is located in a less advantageous position, that would not relieve from infringement. Detroit Motor Appliance Co. v. Burke (D. C.) 4 F. (2d) 118, 123; Penfield v. Chambers Bros. Co., 92 F. 630, 34 C. C. A. 579; King Ax Co. v. Hubbard, 97 F. 795, 38 C. C. A. 423; Murray v. Detroit Wire Spring Co., 206 F. 465, 124 C. C. A. 371.

The refrigeration in the defendants' theater system is controlled by a hand expansion valve exactly the same as in the Rochester Theatre and as in the Lewis patent in suit, when the dew point of the washer water is controlled by hand, and the defendants are in error in their contention that no provision

is made in the St. George apparatus for regulating the moisture content of the air; but in any event this feature forms no part of the invention.

The thermostat in the defendants' theater acts exactly the same as the thermostat in the Fleisher patent in suit and in the Rochester Theatre, and as the hygrostat in the Lewis patent in suit, so that the air fed to the theater will always be governed by conditions in the theater, and not so different from the air in the theater as to produce gusts and drafts, and the defendants are in error in their contention that the theater has no system to insure that the air being fed into the inclosure will always be of a condition approximate to the air of the inclosure.

Defendants contend that their apparatus does not function in the winter; neither did the Rochester Theatre system; but that does not relieve from infringement, as none of the claims in suit relate to winter operation, and it is sufficient that the defendants' apparatus infringes part of the time. Wright Co. v. Herring-Curtiss Co. (D. C.) 204 F. 597.

Defendants cannot escape infringement by the contention that they have a system which is not as efficient as the patented systems, as their system appropriates the patented features. Hinman v. Visible Milker Co. (D. C.) 231 F. 174, 181.

That the fresh air damper of the defendants' system is hand-controlled does not relieve from infringement, as the Fleisher patent is hand-controlled and the 60 per cent. hand-operated damper which exercised the actual control in the Rochester Theatre works the same way as the defendants' fresh air damper, and, even if the defendants' system is an imperfect one (which I do not believe), it would still be an infringement. Sundh Electric Co. v. General Electric Co. (D. C.) 198 F. 116, 125.

The defendants' mixing chambers are the equivalent of mixing chambers of the patents in suit. It is of no moment whether or not the particular form of mixing chamber is employed, inasmuch as there is an area at the entrance end of the conditioner for receiving the air which goes to the conditioner, the operation will be the same.

Defendants' contention with reference to heaters is irrelevant, as the claims in suit do not cover heaters, and they form no part of the invention.

The defendants' contention that there is a difference in fan arrangement is not supported by the evidence; on the contrary, an examination of the patents in suit and the Rochester system shows that in defendants' system the fan arrangement is the same, and that there is no difference in operation.

The testimony as to the mode of operation in defendants' theater by the witness Schlanger is hearsay and need not be further considered.

The witness Schlanger is in error in his testimony that there is no synchronous control of dampers in the St. George system, with the exception of 3 and 4 working together, and that they do not synchronize at all with any fresh air intake damper. Damper 3 of the defendants' system controls the intake of fresh air to the washer, and works synchronously with damper 4 to reinforce the effect of the latter. The defendants' system operates on the same principle as the Fleisher patent in suit, and the Rochester Theatre, and, while there is a difference in the Lewis patent which relates only to the particular mode of installing the apparatus, that does not relieve the defendants from infringement, as they take full advantage of the inventions of both the patents in suit.

Defendants have appropriated every element required to carry out the invention of the patents in suit, and have arranged those elements as in the patents in suit, and this arrangement parallels the adjudicated infringing Rochester system.

The defendants' structure infringes all the claims of the Lewis and Fleisher patents in suit, on which this suit is based.

All of the prior art, consisting of ten patents cited, has already been considered in the Rochester suit and held not to anticipate either of the patents.

Six of these patents were issued to plaintiff's licensees or their assignors and relate to industrial problems.

Three of the remaining patents also relate to industrial problems.

The remaining patent to Peters and Hungerford was issued almost twenty-five years ago, and did nothing to solve the theater problem, and may rightly be described as a paper patent.

Briefly considered, the irrelevance of these citations is clearly apparent.

*Peters and Hungerford patent, No. 843,909.*

Does not teach or even suggest the thought of bypassing.

*Cramer and Hodge patent, No. 1,075,197.*

Covers a humidifier, but there is no refrigeration and no provision for bypassing.

*Braemer patent, No. 1,101,901.*

Covers a humidifier, but there is no bypassing of return air.

*Klein patent, No. 1,296,968.*

The Klein patent is exemplified in the American Bosch prior use. The arrangement covers a jet device through which very hot air up to 1,000° is discharged. Its discharge induces a current in an associated stack, so that air from the room is drawn through the stack and mixes with the hot air from the jet. The air from the jet is always in constant proportion with the air drawn from the room, depending upon the jet speed. By reducing the air through the jet, the air from the room falls off in the same proportion. The constant proportioning of the air volume of the Klein system prevents the altering of the mixture to respond to changing conditions, which must be accomplished if the Lewis and Fleisher inventions are to be carried out, and therefore the Klein nozzles do not and cannot approximate the bypassing employed in the patents in suit.

*Stacey patent, No. 1,330,920.*

Does not teach or even suggest the thought of bypassing.

*Carrier patent, No. 1,393,086.*

There is no bypassing taught in this patent; on the contrary, all the air which is injected into the room is treated.

*Lissauer and Keyes patent, No. 1,416,218.*

This system is entirely closed. It relates to a drying room, and is entirely unsuited to a theater.

*Carrier patent, No. 1,467,306.*

This patent does not teach bypassing and does not disclose a refrigerating apparatus nor the thought of reheating conditioned air by return air bypassing a conditioner.

*Stacey patent, No. 1,550,714.*

Covers a humidifier but no refrigeration. Bypassing air for mixture with cold conditioned air is not even suggested.

*Edwards British patent, No. 15,662, A. D. 1914.*

Does not even suggest the bypassing operation of the patents in suit.

The following alleged prior uses briefly considered show how far removed they are from the teachings of the patents in suit.

*The American Bosch System.*

Has already been considered with the Klein patent on which it is based.

*The Central Park Theatre.*

As originally installed at this theater, cold air was discharged at the rear of the orchestra and was hitting those in the rear of the orchestra in the neck. A small duct was installed at this theater in order to reverse the direction of the flow of air, whereby, instead of discharging cold air, air from the theater was drawn in through the openings directly to a fan, which eliminated the objectionable cold drafts, and at the same time avoided a stagnant condition. This change arose in a wholly incidental way, and its object was merely to correct faulty location of ventilating ducts. There was no thought of producing a new type of system but a mere accident of convenience. The test at the theater showed that only 8 per cent. of the total air was affected, and that this could not effect a rise of temperature of the conditioned air of as much as 2°. It was therefore an inconsequential alteration.

I agree with the court in the Rochester Case that this was so inconsequential as to be of no value.

*The Hennepin-Orpheum Theatre.*

In this theater, sufficient air could not be supplied to a washer, and, in order to increase the air quantity, the washer was widened. The amount of air so supplied remained insufficient, and a hole was made in a wall whereby air from a shaft was additionally provided. This hole in the wall could not be considered a bypass passage, nor could it be employed for bypassing. Either outdoor air or return air could be routed down the shaft, and not a mixture of both. The air from the shaft went directly to the conditioner and through the hole in the wall.

This installation does not and cannot rout outdoor air and return air in segregated volumes, to and around a conditioner. The hole in the wall was designed merely to add air volume. There was no thought of bypassing. This is clearly shown by the fact that there was another washer in the theater for which no hole in the wall was provided, and, if bypassing was desirable, it would be used for the whole theater.

*The Ashland Installation.*

Was a system used for drying matches in an industrial match plant at Ashland, Ohio. A washer and refrigerating equipment were

installed in the basement, and the match room proper was on the top floor of the building.

Air from the match room through a return damper, and in addition outdoor air through a fresh air damper, were adapted to enter the washer and be cooled.

A damper was also provided for admitting return air from the match room directly to a heater chamber leading to the fan. A shaft led from the cooling equipment in the basement to the match room, and in this shaft was a huge interchanger which comprised a series of tubes through which the cold air from the washer was discharged. Two heaters were located at the top of the interchanger in the match room, and all air sent to the match room first went through the interchanger tubes, and then passed the heaters and finally entered the match room.

The return air from the match room was pulled down the shaft by the fan and contacted with the outside surfaces of the tubes comprising the interchanger. The damper leading to the heater chamber at the discharge end of the conditioner did not even approximate the bypass damper of the patents in suit. This damper was a winter expedient, and was not and could not be used in the summertime, when the refrigerating equipment and washer apparatus were in operation. This system could not provide continuous bypassing operation required at all times for reheating conditioned air, and in it bypassing or the idea of bypassing finds no support in the physical combination of elements actually installed, or in their manner of operation.

All of the alleged prior uses presented in the case at bar were considered by the court in the Rochester Case, and I agree with its findings that none of them anticipate.

The claims of the patents in suit on which this action is based are valid and infringed.

The contention of the defendants that because of a supposed failure to give defendants specific notice, plaintiff has forfeited its right to a recovery of damages under section 4900 of the Revised Statutes, title 35, § 49, U. S. Code (35 USCA § 49), is not sustained, as the stipulation Exhibit S. G. 1 admits that the acts constituting the infringement therein set forth in detail were committed by the defendants "since the issuance of the patents in suit, after notice, and prior to the filing of the bill herein."

The defense of laches was not sustained. Assuming that defendants' installation was made in 1928, under the stipulation, it was made subsequent to the issuance of the patents in suit, the date of the Fleisher patent being May 22, 1928, and finding that this action was not filed against them until September 1, 1932, about four years thereafter, such a short delay would not constitute laches, when, as in this case, the patents were in constant litigation from January, 1928, up to the present time. Tompkins v. St. Regis Paper Co. (C. C. A.) 236 F. 221; United States Fire Escape, etc., Co. v. Wisconsin Iron & Wire Works (C. C. A.) 290 F. 171.

The plaintiff is entitled to a decree against the defendants, with costs and the usual order of reference and injunction.

A decree may be entered in accordance with this opinion. Settle decree on notice.

Submit proposed findings of fact and conclusions of law in accordance with this opinion for the assistance of the court, as provided by the Equity Rules and Rule 11 of the Equity Rules of this court.